IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 10 2024

TAMMY H. DOWNS, CLERK
By:_____ DEP CLERK

| | |
|---|---|
| BRIANNA BRADSHAW,<br><br>　　　Plaintiff,<br>v.<br><br>SALINE COUNTY, ARKANSAS,<br>a body politic,<br>CHRISTOPHER S. WEBB, Individually,<br>TINA MCMILLAN, Individually,<br>KATE HAWTHORN, Individually,<br>RODNEY WRIGHT, Individually,<br>WALKER BROWN, Individually,<br>DAVID SNODGRASS, Individually,<br>LISA STUART, Individually,<br>MATTHEW KUNTZ, Individually,<br>JOSEPH MCKINLEY, Individually,<br>ZACHARY MCANALLY, Individually,<br>MILES FRENCH, Individually, and<br>ALISA L. PHILLIPS,<br><br>　　　Defendants. | Case No. 4:24-cv-768-DPM<br><br>***JURY TRIAL DEMANDED**<br><br>This case assigned to District Judge Marshall<br>and to Magistrate Judge Volpe |

## COMPLAINT

NOW COMES, Plaintiff, BRIANNA BRADSHAW ("PLAINTIFF"), by and through her attorneys, LAUX LAW GROUP, and for her cause of action against Defendants, SALINE COUNTY, ARKANSAS, a body politic, CHRISTOPHER S. WEBB, TINA MCMILLAN, KATE HAWTHORN, RODNEY WRIGHT, WALKER BROWN, DAVID SNODGRASS, LISA STUART, MATTHEW KUNTZ, JOSEPH MCKINLEY, ZACHARY MCANALLY, MILES FRENCH and ALISA L. PHILLIPS (collectively "DEFENDANTS"), states as follows:

## JURISDICTION AND VENUE

1. This federal action arises under the United States Constitution, particularly under the Fourth and Fourteenth Amendments, and under law, particularly the Civil Rights Act of 1871,

1

42 U.S.C. § 1983 and Arkansas state law. This Honorable Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 and 1367. Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which PLAINTIFF complains arose in this District.

## PARTIES

2. At all relevant times, PLAINTIFF was a United States citizen and was, therefore, entitled to all legal and constitutional rights afforded U.S. citizens. At all relevant times, PLAINTIFF was a resident of the State of Arkansas.

3. On September 10, 2021, and at all relevant times, Defendant, SALINE COUNTY, ARKANSAS ("SALINE CO.") was a governmental entity, a county, situated in the State of Arkansas, as defined by Ark. Code Ann. § 14-14-102. At all relevant times, pursuant to the Arkansas Constitution, Amendment 55(4), SALINE CO. had the power to fix the number and compensation of deputies and county employees.

4. At all relevant times, SALINE CO. was located in the State of Arkansas, and was the employer—through the Saline County Sheriff's Office ("SCSO")—of CHRISTOPHER S. WEBB ("WEBB"), TINA MCMILLAN ("MCMILLAN") and KATE HAWTHORN ("HAWTHORN"). At all relevant times, the SCSO was a subdivision within the municipality which is SALINE CO.

5. On September 10, 2021, and at all relevant times, WEBB, MCMILLAN and HAWTHORN (collectively "SCSO DEFENDANTS") were each employed by SALINE CO., occupying the departmental ranks of sergeant, deputy and corporal, respectively.

6. On September 10, 2021, and at all relevant times, WALKER BROWN ("BROWN"), DAVID SNODGRASS ("SNODGRASS") LISA STUART ("STUART"), MATTHEW KUNTZ ("KUNTZ"), JOSEPH MCKINLEY ("MCKINLEY"), ZACHARY

Case 4:24-cv-00768-DPM     Document 1     Filed 09/10/24     Page 3 of 14

MCANALLY ("MCANALLY") and MILES FRENCH ("FRENCH") (collectively "BPD DEFENDANTS") each were employed by the Benton Police Department. Relating to departmental ranks on that date, STUART was a police lieutenant, MCANALLY was a police sergeant, SNODGRASS was a police detective and BROWN, KUNTZ, MCKINLEY and FRENCH were police officers.

7.     As law enforcement officers on September 10, 2021, SCSO DEFENDANTS and BPD DEFENDANTS each had a duty to protect and serve the public and to refrain from unconstitutional and malicious acts. On September 10, 2021, and at all relevant times, each of the SCSO DEFENDANTS and BPD DEFENDANTS acted under the color of state law and within the scope of his or her employment.

8.     On September 10, 2021, and at all relevant times, RODNEY WRIGHT ("WRIGHT") was the SCSO sheriff. As SCSO sheriff, WRIGHT was responsible for ensuring that all the duties of all by SCSO deputies—including SCSO DEFENDANTS—were performed within the limitations of the U.S. Constitution, particularly the Fourth Amendment's prohibition of unreasonable seizures.

9.     As SCSO sheriff, WRIGHT was SALINE CO.'s final policymaker in creating, implementing and maintaining all policies governing the conduct and discipline of SCSO DEFENDANTS, including the training of SCSO DEFENDANTS. On September 10, 2021, and at all relevant times, WRIGHT acted under the color of state law and within the scope of his employment.

10.    At all relevant times, SALINE CO. was empowered, funded and directed to pay any § 1983 civil rights or intentional tort judgment for compensatory damages, actual damages and attorney fees, if applicable, for which SALINE CO. employees acting within the scope of their

3

employment is found liable. SALINE CO. has the authority to provide for the indemnification of SALINE CO. employees accused of civil rights violations and intentional torts committed within the scope of their employment, and its common practice was to authorize indemnification for such employees. Accordingly, SALINE CO. is an indemnification party regarding the acts and/or omissions of which PLAINTIFF complains.

11. At all relevant times, Defendant, ALISA L. PHILLIPS ("PHILLIPS"), a resident of the State of Arkansas, was DEVON SOTO's ("SOTO") grandmother and the registered owner of a white Jeep Cherokee which she allowed him to use as though it was his own.

## FACTUAL ALLEGATIONS

12. On September 10, 2021, at approximately 12:19 a.m., PLAINTIFF was a front seat passenger in PHILLIPS' white Jeep Cherokee ("Jeep" or "SOTO's Jeep") driven by SOTO traveling southbound on Congo Ferndale Road near Cypress Lane in Saline County, Arkansas. At that time, there was also a backseat passenger in SOTO's car, Lily McGarragh, who on that date was a 15-year-old minor.

13. The Jeep driven by SOTO on that date was owned by PHILLIPS and, at all relevant times, PHILLIPS allowed SOTO to drive her Jeep even though she knew SOTO was an incompetent, inexperienced and/or reckless driver with prior traffic infractions and a history of substance abuse.

14. On September 10, 2021, at approximately 12:19 a.m., WEBB—who was seated in his police vehicle which was stationary and facing northbound—observed SOTO's Jeep traveling southbound.

15. Prior to that time, SCSO DEFENDANTS and BPD DEFENDANTS were familiar with SOTO and/or his Jeep from prior police encounters.

16. At the time WEBB observed SOTO's Jeep traveling southbound on Congo Ferndale Road, SOTO was not exceeding the posted speed limit and did not have his bright lights activated.

17. At that time, PLAINTIFF, a front seat passenger in SOTO's Jeep, had her seatbelt fastened.

18. SOTO drove southbound past WEBB, who quickly maneuvered a U-turn and began to pursue SOTO. WEBB then activated his emergency lights and siren and accelerated in SOTO's direction.

19. While initiating his pursuit of SOTO, WEBB radioed HAWTHORN and MCMILLAN, requesting they join the pursuit.

20. HAWTHORN and MCMILLAN followed WEBB's direction and activated their emergency lights and siren, joining the pursuit of SOTO by driving northbound on Congo Ferndale Road toward SOTO and WEBB.

21. Still traveling southbound on Congo Ferndale Road behind SOTO, WEBB caught up to SOTO's Jeep, with both vehicles reaching high speeds.

22. Around this time, WEBB radioed dispatch and requested the Arkansas State Police (ASP) join the pursuit and/or provide other assistance in regard to his pursuit of SOTO.

23. As WEBB continued his pursuit of SOTO southbound on Congo Ferndale Road between Avilla West and Steel Bridge Road, he radioed dispatch, describing "speeds [of] about 80 mph," which was a misrepresentation because he and SOTO were driving at a much higher speed at that time.

24. According to WEBB, as he drove south on Congo Ferndale Road, approaching cross street Steel Bridge Road, he could no longer see SOTO's Jeep.

25. At approximately 12:21 a.m., WEBB radioed dispatch, authorizing the use of spike strips. Spike strips incapacitate a moving vehicle by damaging its tires and, therefore, pose a known risk of loss of control and/or collision, especially when counter-indicated. SCSO DEFENDANTS and BPD DEFENDANTS were aware of the risk of death or serious bodily harm posed by the unreasonable use of spike strips during high speed pursuits.

26. WEBB's authorization for the use of spike strips was radio-wide, meaning anyone listening to the frequency—including SCSO DEFENDANTS and BPD DEFENDANTS—would believe they were authorized to use spike strips to stop and/or seize SOTO.

27. Around this time, WEBB did not radio dispatch to communicate that he had discontinued his pursuit of SOTO's Jeep.

28. Around this time, WEBB did not discontinue his pursuit of SOTO's Jeep.

29. At approximately 12:23 a.m., WEBB radioed dispatch, stating: "I think I lost him."

30. Around this time, WEBB gave instructions to anyone listening to "try to cross and go up [Highway] 298 in case [SOTO] comes out on Steele (sic) Bridge."

31. At approximately 12:24 a.m., WEBB radioed dispatch, stating: "Notify Benton also we're coming up on Salem [Road]."

32. WEBB claimed to regain sight of SOTO's Jeep traveling eastbound on Mulberry Salem Road where it abruptly turned south onto Congo Road with its lights off. According to WEBB, he was struggling to keep SOTO's Jeep in sight and, as he passed Scott Salem Road, he was unable to locate SOTO's Jeep.

33. Around this time, SOTO demanded that PLAINTIFF search for his cellphone which had fallen from the console onto the interior car floor during the pursuit. PLAINTIFF

unbuckled her seatbelt to look for the phone, and demanded that SOTO slow down and let her out of the Jeep.

34. At approximately 12:27 a.m., BROWN, on Congo Road facing northward, observed SOTO's Jeep traveling southbound on Congo Road, crossing Troy Drive.

35. Even though SOTO was already being pursued by SCSO DEFENDANTS, BROWN maneuvered a U-turn, activated his lights and sirens and joined the pursuit of SOTO's Jeep southbound on Congo Road. Around this time, SNODGRASS, STUART, KUNTZ, MCKINLEY, MCANALLY and FRENCH joined and/or authorized the pursuit as well.

36. Upon seeing SCSO DEFENDANTS and BPD DEFENDANTS again pursuing him, SOTO increased his speed at that time, preventing PLAINTIFF from safely exiting the Jeep.

37. Traveling southbound on Congo Road, SOTO's Jeep reached Military Road and turned left on Military Road with WEBB, MCMILLAN, HAWTHORN, BROWN, SNODGRASS, STUART, KUNTZ, MCKINLEY, MCANALLY and FRENCH in pursuit.

38. According to BROWN, "the pursuit reached 120 MPH" along Military Road in a southwesterly direction.

39. Upon information and belief, one of the SCSO DEFENDANTS or BPD DEFENDANTS set up spike strips and/or another obstructive device near the intersection of Military Road and Main Street where SOTO's Jeep was approaching.

40. Upon information and belief, the spike strips were partially concealed and placed near a curve in the road, where it was dark and unilluminated. Upon information and belief, one of the SCSO DEFENDANTS or BPD DEFENDANTS positioned his or her police car so that its floodlight would shine in the face of an oncoming driver prior to the intersection—here, SOTO—blinding the driver in such a manner as to be likely to kill the individual, given the circumstances.

41. SOTO had no opportunity to stop once he observed the spike strips placed in the road by one of the SCSO DEFENDANTS or BPD DEFENDANTS.

42. SOTO was temporarily blinded by one of the DEFENDANTS' floodlights and SOTO's Jeep ran over the spike strips, causing him to lose control of the Jeep. SOTO's Jeep tumbled off of the roadway, turned sideways and struck multiple roadside objects before snapping a power pole in two and coming to rest on private commercial property.

43. SCSO DEFENDANTS or BPD DEFENDANTS, under color of law, sought to stop SOTO's Jeep in which PLAINTIFF was traveling by means of a floodlight, spike sticks and/or another obstructive device, and they succeeded in doing so.

## PLAINTIFF'S DAMAGES

44. As a result of DEFENDANTS' conduct, PLAINTIFF suffered major permanent injuries, including a skull fracture, traumatic brain injury (TBI) and multiple serious physical injuries requiring she be taken for emergency medical treatment via LifeFlight helicopter. PLAINTIFF still suffers greatly from the injuries she sustained on September 10, 2021, including left side body paralysis.

## COUNT I
## SCSO DEFENDANTS AND BPD DEFENDANTS
## UNREASONABLE SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT

45. PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

46. Violation of the U.S. Constitution's Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs when there is a governmental termination of freedom of movement through means intentionally applied. It is enough for a seizure that a person be stopped by the instrumentality set in motion or put in place to achieve that result.

47. SOTO's Jeep—in which PLAINTIFF was traveling—was stopped by the instrumentality SCSO DEFENDANTS or BPD DEFENDANTS put in place to stop it, therefore constituting a claim of Fourth Amendment seizure.

48. SCSO DEFENDANTS and BPD DEFENDANTS seized PLAINTIFF when they placed an obstruction in roadway and/or shined extremely bright flood lights in SOTO's face during a high-speed pursuit, causing him to lose control of his vehicle as a result of hitting the roadway obstruction and/or losing his visual acuity due to the flood lights.

49. To determine whether a seizure is reasonable requires an inquiry as a balance of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.

50. SCSO DEFENDANTS and BPD DEFENDANTS did not have probable cause to initiate any traffic stop of SOTO's Jeep because SOTO had committed no traffic infraction prior to the pursuit, meaning their were no important government interests to justify the intrusion on PLAINTIFF's Fourth Amendment interests.

51. Neither SOTO nor PLAINTIFF was a fleeing felon.

52. Reflecting his unconstitutional conduct and malicious intent, WEBB drafted two (2) separate incident reports which contain multiple falsehoods and contradict each other. WEBB fabricated a false narrative that SOTO's Jeep had its bright lights activated to create a pretext for pursuing him. WEBB fabricated a false narrative that SOTO was speeding to create a pretext for pursuing him.

53. The conduct of SCSO DEFENDANTS and BPD DEFENDANTS was unnecessary, objectively unreasonable and excessive and was, therefore, in violation of PLAINTIFF's Fourth Amendment Rights.

54. By reason of SCSO DEFENDANTS and BPD DEFENDANTS' conduct, PLAINTIFF was deprived of rights, privileges and immunities secured to her by the Fourth and Fourteenth Amendments to the U.S. Constitution, including due process, and laws enacted thereunder.

55. SCSO DEFENDANTS and BPD DEFENDANTS' actions were unnecessary, objectively unreasonable and deliberately indifferent. Therefore, they are liable to PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

## COUNT II
## SCSO DEFENDANTS AND BPD DEFENDANTS
## VIOLATIONS OF FOURTEENTH AMENDMENT DUE PROCESS

56. PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

57. The "intent to harm" standard applies to all § 1983 substantive due process claims based on the conduct of public officials engaged in a high-speed automobile chase aimed at apprehending a suspected offender.

58. SCSO DEFENDANTS and BPD DEFENDANTS intended to harm and injure SOTO and the individuals traveling with him, including PLAINTIFF.

59. SCSO DEFENDANTS and BPD DEFENDANTS also acted with such conscious disregard for extreme danger that it constitutes willful recklessness.

60. SCSO DEFENDANTS and BPD DEFENDANTS knew SOTO based on prior interactions with their respective departments.

61. SCSO DEFENDANTS and BPD DEFENDANTS had no legitimate basis for depriving PLAINTIFF of her constitutionally protected liberty interests.

62. SCSO DEFENDANTS and BPD DEFENDANTS' conduct was outrageous and shocks the conscience, thereby violating PLAINTIFF's substantive due process rights.

## COUNT III
### SALINE CO. AND RODNEY WRIGHT
### *MONELL* AND FAILURE TO TRAIN

63. PLAINTIFF hereby restates and realleges all preceding paragraphs as if fully set forth again in this paragraph.

64. A *Monell* "custom" is defined as a practice of municipal officials that is not authorized by written law, but which is so permanent and well-settled as to have the force of law. At all relevant times, including in September 2021 and prior thereto, there existed an unconstitutional *Monell* municipal "custom" at SCSO whereby SCSO sheriffs, including WRIGHT, knowingly allowed his deputies to engage in reckless motor vehicle pursuits despite the fact that such a custom constitutes a continuing violation the Fourth Amendment.

65. The creation and implementation of pursuit policies and the training and supervision under those policies are not hurried decision subject to the "intent to harm" standard, making the substantive due process "shocks the conscience" test the point of analysis.

66. Regarding intentional acts that produce constitutional injury, conduct that is intended to injure in some way unjustifiable by any government interest is likely to be conscience-shocking.

67. Where state actors have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action "shocks the conscience" and violates due process if it is done with subjective or criminal recklessness.

11

68.    SALINE CO. and WRIGHT's acts and/or omissions described above constitute deliberate indifference, recklessness and/or an intent to harm in their policymaking, training and supervisory functions.

69.    The allowance of this pattern was the result of deliberate indifference to fact that SALINE CO.'s official policies and/or customs were in violation of the Fourth Amendment and would naturally result in the violation of the constitutional rights of highway motorists and passengers, including PLAINTIFF. The deliberate indifference described above shocks the conscience because it existed in circumstances where actual deliberation was possible.

70.    The official policy and/or *Monell* "custom" described above was the moving force behind the violations of PLAINTIFF's constitutional rights and proximately caused her constitutional injuries. The official policy and/or *Monell* "custom" described above also proximately caused a deprivation of the rights, privileges and immunities secured to PLAINTIFF by the Fourth and Fourteenth Amendments to the U.S. Constitution, and laws enacted thereunder.

71.    The custom described above was the moving force behind the violations of PLAINTIFF's constitutional rights committed by WRIGHT and SALINE CO. and proximately caused her personal injuries, great pain and other damages. The custom described above also proximately caused a deprivation of the rights, privileges and immunities secured to PLAINTIFF by the Fourth and Fourteenth Amendments to the U.S. Constitution, including due process, and laws enacted thereunder.

72.    As a result of the official policies and/or customs described above, PLAINTIFF's Fourth Amendment rights were violated. Therefore, WRIGHT and SALINE CO. are liable to PLAINTIFFS in damages under 42 U.S.C. § 1983, including, loss of liberty interest, punitive damages and attorney fees.

## COUNT IV
## ALISA L. PHILLIPS
## NEGLIGENT ENTRUSTMENT

73. Negligent entrustment is established by showing that: (1) the entrustee was incompetent, inexperienced, or reckless; (2) the entrustor knew or had reason to know of the entrustee's conditions or proclivities; (3) there was an entrustment of the chattel; (4) the entrustment created an appreciable risk of harm to the plaintiff and a relational duty on the part of the defendant; and (5) the harm to the plaintiff was proximately or legally caused by the negligence of the defendant.

74. At all relevant times, including September 10, 2024, PHILLIPS, the entrustor, knew SOTO, the entrustee, to have incompetent, inexperienced and/or reckless conditions and proclivities and, despite this actual notice, she entrusted her Jeep to him, breaching her duty of due care and reasonableness.

75. PHILLIPS' entrustment of her Jeep to SOTO created an appreciable risk of harm to PLAINTIFF, and the harm PLAINTIFF suffered was proximately and/or legally cause by the PHILLIPS' negligence.

76. Therefore, PHILLIPS is liable to PLAINTIFF for the serious injuries PLAINTIFF suffered.

WHEREFORE, Plaintiff, BRIANNA BRADSHAW by and through her attorneys, requests judgment against DEFENDANTS, and each of them, including:

1. That DEFENDANTS be required to pay PLAINTIFF's compensatory damages;

2. That DEFENDANTS be required to pay actual damages;

3. That the individual defendants be required to pay punitive damages; and

4. That DEFENDANTS be required to pay attorney fees per 42 U.S.C. § 1988; and

5. That PLAINTIFF receive any other such relief as this Honorable Court deems just and proper, including declaratory and injunctive relief.

Respectfully submitted,

Michael J. Laux
Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for PLAINTIFF
LAUX LAW GROUP
400 W. Capitol Avenue, Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com
        mikelaux@icloud.com